1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA :
                               :
 4                             :
                               :
 5        vs                   :    3:16-CR-175
                               :
 6                             :
                               :
 7   JAMES BAILEY-SNYDER       :
                               :
 8                             :

 9

10

         BEFORE:       THE HONORABLE MALACHY E. MANNION
11
         PLACE:        COURTROOM NO. 3
12
         PROCEEDINGS:  SENTENCING
13
         DATE:         THURSDAY, MARCH 15, 2018
14

15

16
     APPEARANCES:
17
     For the United States:
18
     TODD K. HINKLEY, ESQ.
19   UNITED STATES ATTORNEY'S OFFICE
     WILLIAM J. NEALON FEDERAL BUILDING
20   SUITE 311
     SCRANTON, PA 18501-2830
21
     For the Defendant:
22
     BRANDON R. REISH, ESQ.
23   31 N. 7TH STREET
     STROUDSBURG, PA 18360
24

25
```

2

1          THE COURT:  This is the matter of the United States

2  of America against James Bailey-Snyder.  Mr. Bailey-Snyder, the

3  criminal number in your case is 3:CR-16-175.  Before we get

4  into that, are you under the influence of any drugs, alcohol,

5  intoxicants or medications that would make you unable to

6  understand the proceedings here today.

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  All right.  There's been a presentence

9  report prepared in the case.  Have you had an opportunity to

10  review that presentence report and discuss it with your

11  counsel, Mr. Reish?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Has the government had sufficient time to

14  discuss -- to review the presentence report?

15          MR. HINKLEY:  We have, Your Honor.

16          THE COURT:  Mr. Reish, how about you?

17          MR. REISH:  I have, Your Honor.

18          THE COURT:  All right.  In addition to that, Mr.

19  Reish, you've prepared a sentencing memorandum that has a

20  number of exhibits on it.  Then you presented some more

21  exhibits today, which I have reviewed.  Mr. Bailey-Snyder, have

22  you seen those?  Those are mostly letters.

23          THE DEFENDANT:  Excuse me?

24          THE COURT:  Have you seen the exhibits that your

25  counsel attached to his sentencing memorandum?

3

1          THE DEFENDANT:  Yes, some of the them.  Most are

2   recently submitted.

3          THE COURT:  I just finished reading those now that

4   were submitted.  Mr. Hinkley, have you had an opportunity to

5   review the sentencing memorandum of defense counsel and the

6   exhibits that he attached?

7          MR. HINKLEY:  I have, Your Honor.

8          THE COURT:  Okay.  All right.  Now, it's my

9   understanding that there are no outstanding objections to the

10  contents of the presentence report.  Is that correct, Mr.

11  Reish?

12         MR. REISH:  That's correct, Your Honor.

13         THE COURT:  Mr. Hinkley?

14         MR. HINKLEY:  No objection on behalf of the

15  government, Your Honor.

16         THE COURT:  All right.  So, gentlemen, then the

17  procedure we will take is first I'll ask if there are any

18  requests for formal departures under the guidelines.  And then

19  after that, we will move on to variances requests which I would

20  ask counsel to include in whatever statements they wish to make

21  concerning sentencing in the case.  When we get to that aspect

22  after we talk about any request for departure, then we will

23  begin with Mr. Reish and whatever you wish to say, whatever

24  witnesses you wish to call.  Then we will move on to Mr.

25  Bailey-Snyder, and then finally we will go over to Mr. Hinkley

4

1  and cover that.

2          So that being said, are there any formal motions

3  under the guidelines for departures, Mr. Reish?

4          MR. REISH:  Nothing from the defendant, Your Honor.

5          THE COURT:  From the government?

6          MR. HINKLEY:  No, Your Honor.

7          THE COURT:  All right.  So then, counsel, if you

8  don't mind, we will, as I said, incorporate your request for

9  any variances along with your statements related to whatever

10 argument you wish to make on the case.  Mr. Reish, we will

11 begin with you.

12         MR. REISH:  Thank you, Your Honor.  Your Honor, I --

13 youth, family ties, character, traits and an appreciation for

14 the time that he spent -- Mr. Bailey spent time in pretrial

15 confinement as we note in our sentencing memo are the three

16 areas we ask this Court to consider.  I would at this point

17 also like to recognize the Court did reschedule this to allow

18 Frances Snyder to attend.  We appreciate that.  She did attend

19 trial as well.

20         The three factors that I highlighted in the

21 sentencing memo are -- of course, they missed one major factor

22 the Court often looks to in sentencing.  It would be remorse or

23 acceptance of responsibility.  This was a trial however, and

24 the Court won't hear that today.  And Mr. Bailey will appeal

25 this -- he has informed me he would like to do that.  I believe

5

1  we will do that.  He may make a statement.  He may choose not

2  to make a statement.  I've had an opportunity to discuss those

3  issues with him.

4          The first issue I want to address -- and I will take

5  it backwards -- was the confinement he spent awaiting trial in

6  this matter and awaiting charging in this matter, Your Honor, I

7  -- I mentioned it was nearly 11 months.  That's incorrect to a

8  certain extent.  I wanted to present two exhibits that help

9  explain why I wasn't sure of the exact amount and nature of

10  that and clarify the exact number.

11          THE COURT:  Okay.

12          MR. REISH:  Your Honor, I received these from the

13  federal government.  It's defendant's one and defendant's two.

14  They were computer printouts of the inmate's work history

15  detail and disciplinary records.  It wasn't until I looked at

16  the work history detail determining how long he had been in

17  administrative detention and then combined with the

18  disciplinary record and try to look at the acronyms to figure

19  out what happened, it does appear that Mr. Bailey prior to this

20  incident in August of 2015 had -- he did have disciplinary

21  action.

22          The presentence report notes he had some disciplinary

23  problems in jail.  He just had one major one for a heating coil

24  that he cooked on.  He did do some time on that.  It was before

25  he's alleged to have possessed this shank.  Now, August 10 of

1    2015, when he was placed in administrative segregation

2    detention, he then did have an opportunity on two separate

3    occasions to receive specific time in there to turn into

4    disciplinary segregation, although for Mr. Bailey it was still

5    just time spent in a very small space, probably a similar size

6    to which Your Honor is sitting at behind the bench.  But it

7    might be smaller than that.

8           He did receive 30 days for blocking a cell door.  He

9    received 15 days for refusing to obey an order, and he received

10   another 30 days for refusing to provide a urine sample.  So

11   there were about 75 days that I didn't account for that 11

12   months.  But other than that, he spent a substantial amount of

13   time in a very small space.

14          And the presentence report notes that Mr. Bailey as a

15   young man back in 2010 had been diagnosed with A. D. H. D. and

16   O. D. D.  And to take somebody with that diagnosis and put them

17   in that small space for that very long amount of time, it isn't

18   surprising he had some disciplinary infraction.  What is

19   surprising it was only those.  His time in that space affected

20   him greatly.

21          We are asking the Court -- and I laid out reasons in

22   the sentencing memo why the Court should consider that in terms

23   of a variance.  So I can't capture that as a time credit.  I

24   realize that.  There's really nothing under the guidelines that

25   allows me to argue for that time.  It certainly did show Mr.

1 Bailey that what he was accused doing is a serious thing.  If

2 he hasn't appreciated the seriousness of his offense after

3 those moments that he spent day after day after day in that

4 small space, there's not much that can be done in the

5 departmental setting in the Bureau of Prisons setting.  So we

6 will ask the Court to consider that.

7       The character that I point to for Mr. Bailey, there's

8 two sides of it.  There's things that have caused Mr. Bailey as

9 a young man to go a certain way, and that has to do with

10 actions from before this case.  It has to do with when he was

11 18 and 19 years old and he was getting himself convicted of

12 felony offenses.  The letters note that he had a lack of

13 youthful guidance.

14       In the letter that was just presented to Your Honor

15 this afternoon by Joseph-- stand, please, Joseph.  Joseph goes

16 by Joseph V., V-a-i-s-s-i-g-h-a-s-a-b-e-h.

17       THE COURT:  I have reviewed his letter as well.

18       MR. REISH:  You can have a seat.  He does through his

19 early memory of James remember times when he sees optimism,

20 sees compassion, sees good characteristics.  Then he also saw

21 some negative things.  He saw Mr. Bailey hanging out with an

22 older crowd, saw him using drugs.  He sees the absence of a

23 father figure, the absence of a father figure from his own

24 father who passed when James was four was then in 2012

25 complicated further.  In defendant's four, Patsy Bailey notes

8

1   that Mr. Bailey-Snyder's uncle with whom he had worked with --

2   the uncle he was working with and was employed with also died.

3   This is five months before he commits the federal offense that

4   he was serving time for when the alleged incident conviction

5   from that incident which is now --

6          THE COURT:  The Baltimore, Maryland gun offense?

7          MR. REISH:  Correct, Your Honor.  When he started to

8   serve time, he was able to keep contact with certain people,

9   and he was able to be a positive influence, and there were

10  various letters already submitted to the Court with the

11  sentencing memo, a letter from Barbara Evans, a letter today

12  from Sabrina Cleveland, people who know him, parents of inmates

13  who are at Lackawanna County prison who thought that Mr. Bailey

14  showed an act of kindness, something that shows compassion, a

15  favorable quality.

16          I point to these because the government certainly is

17  going to point to all the negative things he did.  The

18  government will argue he was convicted of having a shank,

19  something that is unsafe to have in a jail, that he committed

20  disciplinary infractions while he was in jail.  At the same

21  time he was doing positive things from jail.  There's a lengthy

22  letter from Shannon Cronin, who is present.  And I think Ms.

23  Cronin who in her letter notes that Mr. Bailey-Snyder has

24  helped to keep her sober through his contact.

25          She has traveled up here.  She would like a moment

1   and realizes the Court read this letter but to explain --

2           THE COURT:  I'd appreciate in the future if you

3   submit the letters that you follow the local rules on 14-point

4   type.  It took me a long time to read through the letter.

5           MR. REISH:  I recently turned 40, and my doctor told

6   me I would need reading glasses.  I have a pair in my other

7   bag.  I apologize.  I understand that.

8           THE COURT:  To be 40 again.

9           MR. REISH:  Thank you.  Yeah, that's -- in the future

10  I'll take care of that.  And again in this hearing I would ask

11  if it's appropriate now to have Ms. Cronin speak to the Court.

12          THE COURT:  Sure.  She can come up.  That's fine.

13          MS. CRONIN:  Good afternoon.

14          THE COURT:  If you'd just state your name for the

15  record and spell your last name.

16          MS. CRONIN:  Shannon Cronin, C-r-o-n-i-n.

17          THE COURT:  All right.  Ms. Cronin, you submitted a

18  relatively lengthy letter dated March 14th.

19          MS. CRONIN:  Yes, I got it out yesterday or last

20  evening.  There was a few typos because I was in a rush but --

21          THE COURT:  Okay.

22          MR. CRONIN:  I apologize.

23          THE COURT:  There were only two.

24          MS. CRONIN:  Were you able to read it?

25          THE COURT:  Yeah, there were actually two typos.

1          MS. CRONIN:  Yeah.

2          THE COURT:  Person instead of prison.  I forget the

3    other.

4          MS. CRONIN:  I think unconditional lover instead of

5    love.

6          THE COURT:  You did lover with an "R." instead of

7    love, that's correct.  I understood it in the context of what

8    it meant.

9          MS. CRONIN:  I am here today in support of -- on

10   James' behalf, you know.  We've been friends over ten years

11   now.  And, you know, there's nothing negative I can say about

12   this gentleman.  He -- throughout my time in knowing him, he's

13   been nothing but one of my biggest support networks I have in

14   my life.  As you can see in my letter, you know, I relate to

15   James on a lot of different instances being I was 13 when I

16   watched my mom die in front of me of lung cancer, and the

17   effect that takes on such a young person at that age is, you

18   know, it's unexplainable.

19          And, you know, I don't -- I've been through a lot in

20   my life, and I have learned a lot of hard lessons myself.

21   There's -- you know, I learned honesty is the key, and I've

22   struggled for a very long time after losing my mom from drugs

23   and, you know, major depression trying to get back on my feet.

24   And it took me a long time.  I lost my mom when I was 13.  I

25   will be 30 in May.  This is the first time I had a year clean

1  in my life.  All my family gave up on me.  This man right here,

2  he's never given up on me.  He's never judged me.  He's always

3  believed in me.  He's given me good advice, tried to guide me

4  and making the right choices and next the right steps to help

5  me better my life.

6          Every time I talk to him he puts me in good spirits,

7  puts a smile on my face.  He's highly intelligent, highly

8  educated, goal oriented, you know.  He has very high hopes for

9  his future and plans what he wants to do in his life.  And, you

10  know, when it came down to the psychological aspect of, you

11  know, the time he spent on lockdown and how that can affect --

12  I've been in and out of the jail myself, rehabs, psych wards,

13  name it.  I've been there.  I've done it.  And, you know, I was

14  given opportunities and chances and chances, and, yeah, I

15  messed up a lot.

16          But there comes a point where you grow up, and

17  there's a time where you realize, you know, those mistakes and

18  you learn from them.  And I believe after speaking to James on

19  a regular basis that, you know, he's accepted what consequences

20  came from his actions and that he's dealt with his punishment

21  for, you know, what he's done.  And, you know, he's still so

22  young that he's got such a long future ahead of him, and I just

23  -- you know, I think he's -- he's got the potential to be so

24  right and help community and be -- you know, be there for his

25  family.  He has so many people that love and care about him

1  it's unreal.  Like I said, I never met any more positive person

2  in my life especially all time he spent, you know.  He never

3  has a negative outlook on life or anything.  Like, it's just --

4  it's amazing and blows my mind.  And I just -- I can't say

5  anything more.  You read my letter.

6         I just -- I feel that he was just -- he's so close to

7  finishing his original sentence that any more extended time is

8  really just unnecessary being it's -- you know, he's been

9  punished with the -- you know, being on lockdown, taking the

10  phone calls away from the people that is his support network

11  and that does keep him in high spirits and keeps him pushing

12  forward, you know.

13         Psychologically that can damage somebody, and I just

14  -- it doesn't help when trying to rehabilitate and put yourself

15  back into society, you know, being so secluded from everybody,

16  you know.  You get stuck up in your head, and that's not a good

17  place to be.  And for him, he's -- like I said, been in such

18  high spirits and stayed positive the entire time.  And I just

19  -- I just want to see him get out and, you know, achieve his

20  goals that he has set for himself in his life.  I believe he's

21  got the potential to do great.  Just consider that in, you

22  know, today's sentencing.  That's all I ask.

23         THE COURT:  Thank you, Ms. Cronin.

24         MS. CRONIN:  You're welcome.

25         MR. REISH:  The final factor I highlighted was the

1   first factor in the memo that dealt with youth and the unique

2   characteristics of people that are under the age of 25.  Mr.

3   Bailey at this time is 22.  At the time of his prior offenses

4   he was only 18 or 19 years old.  And I think that was argued

5   sufficiently in the memo as to the guidelines.  I can't argue

6   age.  I can't argue this policy statement justifies a

7   departure.  But I can certainly ask a defendant's

8   characteristic the statutory factors would give the Court the

9   ability to consider age, consider his youth.

10          While the Sentencing Commission has made a study back

11  in May 2017 about youthful offenders, the guidelines don't make

12  the distinctions that I've argued.  I recognize that.  There's

13  -- they've said this is how criminal history will be

14  calculated, we will calculate it to include all these types of

15  offenses.  We're getting to the point hopefully where juvenile

16  adjudications will no longer count.  But even that hasn't been

17  formalized yet.  It's been recommended or proposed but not

18  formalized because of the Sentencing Commission and I guess the

19  amount of members of that.

20          THE COURT:  But even juvenile offenses wouldn't apply

21  in his case because he was more than 18 as you mentioned in

22  your memorandum.  While I read all of that, it seems somewhat

23  of an academic argument considering that even if that was the

24  case, it does not apply to Mr. Bailey-Snyder.  And for our

25  purposes here today, at the time he committed these particular

1    acts he was 23 years old roughly.

2            MR. REISH:  He may have been -- he was 22 or 23.

3            THE DEFENDANT:  August of 2015.

4            THE COURT:  So 22, okay.

5            MR. REISH:  Thank you, Your Honor.  I understand I am

6    pushing the bounds of what is presently not -- it's not

7    presently acceptable -- but where we're headed, but the

8    underlying basis is what I was drawing the Court's attention

9    to.  And there would be some distinctions between adults and

10   youth, youthful offenders.  I would ask Ms. Bailey-Snyder --

11   I'm sorry, Ms. Snyder -- she was nervous about speaking.

12           MS. SNYDER:  It's -- I'm just sick.

13           MR. REISH:  She's sick.  If I may, I asked her

14   outside if there was some -- something that would be different

15   should James be released, should he be out and when he gets

16   out, whenever it is, and he would be a benefit -- are you able

17   to come up here and talk briefly as to that, Frances, please?

18           THE COURT:  There isn't any reason to be nervous.

19           MS. SNYDER:  No.  I'm sick.  I was actually supposed

20   to go to the hospital, but I wanted to make sure I made it

21   here.  I feel that my son's already been doing the 23 and one

22   situation since the incident occurred back in 2015, which I

23   think is inhumane for long periods of time.  And as far as I

24   know or remember out of the situation, he was already given

25   jailhouse charge for the offense which would have him going

1  back basically to no phone calls, no commissary, no visitation

2  until his -- the rest of his original sentence is complete.  So

3  that could ultimately be almost five years in that kind of

4  situation.  It's too much.

5          THE COURT:  Bob, there should be tissues there.

6          MS. SCHNEIDER:  But he's got to -- he's got a good

7  heart.  And you ultimately have the power to do whatever.  From

8  the presentencing paperwork that I read, the -- whoever

9  probation officer or whatever hopefully fixed the stuff that

10 was wrong at least on my statement, but I did note that they

11 showed there was a difference in prices that, I guess, we the

12 taxpayers pay for people that are incarcerated versus, I guess,

13 halfway houses and basically probation.  And from one extreme

14 to the next or from one point to the other, it's almost --

15 probably $25,000 a year, close to.  I think my son should be

16 home.

17          Once his seven years are done, I think he should be

18 home.  I think he's done his whatever for whatever the jury

19 thinks that they found him guilty on.  I disagree with their

20 verdict, but that's my opinion.  But I mean ultimately it's all

21 up on you, I mean, the -- what will be done with this.  I mean,

22 you don't have to follow guidelines.  You are the end.  I mean,

23 you can change things.  I mean, actually the original

24 sentencing judge that my son had went to with the gun charge,

25 they lied.  He was supposed to be going to someplace, a

1   military compound in New Jersey where they had educational

2   programs for him to go to college and technical -- just

3   classes.  They don't have no classes in federal prisons.  They

4   don't have anything for him to learn.  He can't take college

5   courses.  You know, how do they expect them to come back out

6   into society if you stick them in a hole for 23 and one for

7   five years?  I'm curious, really curious.  There's -- and not

8   actually expect a mental break.  I mean, I'm surprised that,

9   you know, he actually has an upbeat attitude.  He does.

10          I mean, he brings positive -- positive attitude

11  towards other people, gets them feeling better when the

12  situation he's in, it's, like, you think you would -- who wants

13  to eat chickpeas and noodles?  It's crazy.  I hope that you

14  will take into consideration -- I know that a lot of people

15  wrote for my son and a lot more wanted to.  We didn't get

16  notice.  We got four days' notice of this court time and date.

17  We found out about it on Friday, and you postponed it for two

18  days more.  So -- but I appreciate your time and hope that you

19  will be not that rough.

20          THE COURT:  All right.  Thank you, Ms. Snyder.

21          MS. SNYDER:  Thank you.

22          MR. REISH:  Your Honor, the delay in notice to her

23  was my office, not from the Court.  We did have some mass power

24  outages and things, and I did apologize that she hadn't gotten

25  the notice the Monday and -- but I am glad the Court was able

1  to continue it.

2          THE COURT:  No problem.

3          MR. REISH:  I will end that presentation from Ms.

4  Snyder, Your Honor, and ask the Court to take all my arguments

5  into consideration.

6          THE COURT:  All right.  Thank you, Mr. Reish.  Mr.

7  Bailey-Snyder, anything you want to say before I impose

8  sentence?

9          THE DEFENDANT:  Yes, Your Honor.  I have a few

10  things.  First off, there was a few things that I believe a

11  mischarge of justice in this trial due to the prosecutor

12  conduct and procedural error, you know.  I want to put that on

13  the record because I will be raising it in appeal, and I have

14  seen that in certain cases that they mention that people don't

15  say nothing at sentencing about the procedures that took place.

16          THE COURT:  Actually any objections that were made

17  during the trial are, in fact, preserved for purposes of

18  appeal.  And so anytime there was an objection that was made to

19  anything that was done at trial or arguments related to that at

20  trial, that's preserved for appeal.

21          At sentencing the only things that would be waived at

22  sentencing would be an objection to some of the procedures or

23  things that occurred in sentencing.  In other words, this is

24  not a time where anything that is said now about the trial

25  preserves anything.  The trial is over with.  That had to be

1  done at the time of the trial.  To preserve a record at

2  sentencing is any objections to any of the procedures that

3  occur here at the sentencing.  If you have any objections to

4  that -- that's why I asked there was no objections to the

5  contents, for example, of the presentence report.

6          THE DEFENDANT:  Right.  I do -- I would like to bring

7  something up about that.  It strikes me very -- I am very

8  curious why the probation officer -- they still use Equifax

9  after Equifax have a leak of 144 million plus individuals'

10  sensitive data and the government would still have a contract

11  with them in order to do business with people that allow that

12  to happen.  And I haven't been home to use my credit.  I am

13  possibly at risk, and a lot of other people are at risk at the

14  time, you know.  But I don't think the government should be

15  using that type of software and -- there's two other credit

16  bureaus that they can check that data with.  I would -- I mean,

17  this is the taxpayers' money I would like to see go to use, not

18  to people who are breaking laws themself who are very reckless

19  with people's information.

20          As far as my own self goes and, you know -- I notice

21  that there's alternative sentences you can sentence me to in

22  this case, you know.  House arrest is a form of confinement,

23  and it is a form of imprisonment because I am confined to a

24  house, you know, on G. P. S. monitoring.  If I do violate the

25  terms and conditions, I will be sent back to prison, you know.

1   There is community confinement.  There is community service.  I

2   want to go home and help my community.  I don't want to be

3   asset only to my community.  I want to be an asset to other

4   people's community, you know.  A lot of people live very good

5   lives, and people come up here at the drop of a dime.  If I had

6   more notice, I probably would have had more people come to the

7   courtroom on my behalf because people would have been able to

8   take off work for this occasion.

9           And I believe that I can do a lot, and I know I can.

10  And I got faith in myself, and I -- I believe -- you know, I

11  want to own businesses in order to provide jobs to communities.

12  You know what I mean?  It's not just thinking about myself.

13  I've never been about myself.  I'm a selfless person, you know.

14  And throughout this whole ordeal, I've been confined to

15  lockdown situations for the last two years on and off.  Really

16  out of the last 31 months I've been confined 24 months

17  straight, you know.  I am going back to a federal prison where

18  I am going to be confined to a lockdown situation for another

19  four to six months until I get transferred and possibly another

20  12 to 18 months from there.

21          So this is a -- it is, like, a bad nightmare.  It's

22  never ending.  And I am so fortunate to have people on the

23  outside that write back and communicate back with me and they

24  pick the phone up.  It's hard not to have any type of ties.  I

25  know this because I help individuals out because they don't

1  have any ties in jail.  I give people stuff because they don't

2  have it, and I am fortunate and blessed, you know.  And I hope

3  that never occurs to me.  I hope that, you know -- I had a lot

4  of people die since I've been incarcerated.  I have a lot of

5  people die, you know.  I hope it ceases, but life goes on.  You

6  know what I mean?  As I sit incarcerated, I just -- it's, like,

7  I'm sitting on a shelf aging, like, collecting dust or, like,

8  cognac or wine that ages over time.  And it's unfortunate

9  because I see my family, how detrimental it is.  It's such a

10  burden and hardship.

11          And my friends -- and this is -- it's just crazy

12  because my mother is sitting up there crying.  She's 56 years

13  old.  You know, it breaks my heart to even have to have people

14  come up here and even acknowledge something like this or put

15  them through this burden after already doing extensive amount

16  of time.  Some people can't even tell their families that

17  something like this occurred, they will cut them directly off.

18  No, this ain't happening again.  I am fortunate I have a great

19  support system within the community, within my family.

20          And I believe that with the proper opportunity I can

21  show not just yourself or other people -- I can show a lot of

22  people because breaking the law, that's over.  That's a thing

23  of the past, and I don't intend to reflect on the past or study

24  the past.  I mean, you have to study it to move forward and not

25  to repeat history.  But at the same token, I am focusing on the

1 day and prepare for tomorrow.  I have a bright future ahead of

2 me, but you have the ultimate say.  So what occurs today, that

3 will be detrimental to my future or productive to my future,

4 and it weighs in your balance.  And I ask you to take into

5 consideration the tools that you have in your disposal to help

6 my future be brighter because like my mother said, they don't

7 have vocational training.

8          I got my sentencing transcripts from my Baltimore

9 case, and I am supposed to be sentenced Fort Dix.  It was

10 recommended I go to Fort Dix for vocational and training.  It's

11 in my transcripts.  Since I've been in B. O. P., I haven't had

12 the opportunity for vocational training.  It's not like I don't

13 want to take it.  It's not that I don't want to better myself

14 or, you know, get education.

15          The more things you learn, the more of an asset you

16 are, the more people you can help, or, you know, the better

17 jobs you can get.  So, of course, I am going to obtain any

18 option I can for education or to better myself.  If it's not

19 available, what can I do?  I can't do nothing.  So I am stuck

20 at prison 25 years old.  I am supposed setting up my future for

21 retirement, 401 K.s and, you know, buying my first house and

22 getting married and stuff like that and going to college and

23 graduating college.  You know, I haven't had those

24 opportunities in prison.

25          I don't expect it anymore from the government.  I

1   depend on what people send me from the streets, books so I can

2   educate myself, you know, and talk to other individuals who are

3   intellectual about productive stuff because it's

4   counter-productive for me to continue to even entertain

5   shenanigans.  I can go sit over by myself and think about

6   creating various business plans and various -- I can't even

7   open up a business in prison because it's against the federal

8   law.  So how can I help my family that is struggling out there

9   by being in prison?  I can't.  I can't help nobody.

10           It's hard.  It's hard.  They don't pay you enough to

11   help yourself.  I had three different jobs at Schuylkill being

12   paid $36 a month.  Communications is 21 cents per minute on the

13   phone, five cents per minute on the e-mail, 49 cents for a

14   stamp.  Plus you got to buy bars of soap and hygiene.  It

15   doesn't break -- it doesn't make sense.  It don't add up.

16           So I'm asking you to take all these things into

17   consideration.  I will appreciate it, you know.  Take -- weigh

18   in on that this wasn't -- the pattern is right there.  The

19   government characterizes people by pattern and habit.  Correct

20   me if I'm wrong because I'd like to be enlightened.  I'd like

21   to learn more about this.  This is why I began studying the law

22   and checking in and stuff.

23           That's why I in my correspondence I asked for certain

24   things when I wrote you the letters for the -- for the

25   different appointed counsel and stuff like that, you know.

1  It's just -- it's just hard.  It's very hard to even sit here

2  and be talking about this because it's mind boggling.  It's

3  very mind boggling to say the least.  And, you know, my family

4  and friends, my one friend Mike -- he's from North Carolina.

5  He came up.  My mother, they from Maryland, five and a half

6  hours away.  People still care about me.

7          That -- I help other people, and, you know, I do good

8  things.  At the end of the day, that's all that matters to me.

9  I know I'm a good person.  And at the end of the day, I am

10  content with that.  Thanks for letting me speak.

11          THE COURT:  Thank you, Mr. Bailey-Snyder.  Mr.

12  Hinkley?

13          MR. HINKLEY:  Your Honor, I took a bit of time to

14  read over the defendant's sentencing memorandum as well as the

15  numerous letters that were presented on his behalf.  I have to

16  say I am a bit mystified.  Mr. Bailey-Snyder seems to be a

17  person who cares about others and who offers good advice to

18  others, advice he doesn't seem to take for himself.  This

19  particular crime for which he was convicted of, the possession

20  of a shank in prison is a fairly serious matter because prisons

21  are dangerous places as the Court knows.

22          Possession of shanks in prison is serious because it

23  puts people at risk, not only the administration there, not

24  only the guards but people like Mr. Bailey-Snyder who is housed

25  in those places.  The reason that this is crime to possess

1  those is we are trying to keep it as safe as we can in those

2  places.  So it's a serious matter.  And when I look through the

3  defendant's criminal history, again it's mystifying to me

4  because he seems intelligent.  He spoke very well here today.

5  It's -- clearly he has a lot of potential.  Yet he chooses to

6  involve himself in and actions which are serious crimes.

7          The memorandum filed by his counsel talk about

8  youthful offenders and how youthful offenders should be treated

9  a little bit differently because emotional development and

10  their mental development is not what you would expect of

11  someone older.  These crimes have been committed by Mr.

12  Bailey-Snyder, they are not youthful indiscretions.  He has a

13  robbery conviction where he brandished a knife and made threats

14  to folks while stealing property from them.  He has a

15  conviction for possession with intent to distribute cocaine

16  base crack.

17          He has a conviction for possession of a firearm by a

18  convicted felon where he was suspected of drug distribution,

19  was arrested and found to be in possession of a semiautomatic

20  pistol.  Now, he comes before the Court today having possessed

21  basically a weapon, homemade designed weapon in prison.  These

22  are serious matters.  It mystifies me why he gets himself

23  involved in these things, these serious things he has done in

24  the past.  And it's serious things for which he's here for

25  today.  Now, respectfully, he asked what can he do for his

1  family.  I suggest that he stop committing crimes, that he do

2  his time, obey the rules and go back to his family and be a

3  productive part of society, which I think he can.  But until he

4  makes that decision, there is not much we can do.

5          The guideline range in this particular matter is --

6  30 months is the bottom of the guideline range, and we're

7  suggesting to the Court that a sentence at the bottom end of

8  the guidelines is appropriate based on all of the facts and

9  circumstances as well as the characteristics of the defendant.

10         THE COURT:  All right.  Thank you, Mr. Hinkley.

11  Well, first as I noted, I read thoroughly the presentence

12  report on more than one occasion.  I adopt all of its findings

13  in the presentence report.  I believe it's accurate and

14  correct.  I have read the sentencing memorandum submitted by

15  Mr. Reish as well as all of the letters that were in that

16  sentencing memorandum.  And there were a number of letters,

17  some handwritten, some typewritten.

18         They include a letter from a Ms. Barbara Evans, which

19  was handwritten, a typed letter from Ms. Brandy Bradshaw, one

20  from Mr. Christopher Fidderman-Harris, one from Frances Snyder,

21  who also spoke here today, one from Ms. Jamie Hoffman -- I

22  assume it's Ms. Jamie, it may be Mr. Jamie Hoffman, excuse me.

23  I have read a letter from Pamela Villa.  I have read one from

24  Rick Jones, who apparently is a cousin.  And I have read the

25  letters that were submitted today from Patsy Bailey, Sabrina

1  Cleveland, from Mr. Vassighasebeh, who is here and then finally

2  also from Ms. Shannon Cronin, who spoke here today.  As I read

3  through the letters, they are very positive about you.  There

4  is no doubt about that, that a lot of people are supportive of

5  you.

6          I notice Mr. Vassighasebeh said something in his

7  letter that struck me, and that is -- he said a lot of good

8  things about you.  He indicated your high spirits in the

9  situation indicating because you had been incarcerated pretty

10 much your whole adult life are the words he said.  That is

11 something that is true and is certainly very concerning.  Ms.

12 Cronin, who spoke here today, in her letter I remember

13 specifically her making an indication of one thing I do know is

14 that James has always taken responsibility for his actions and

15 willingly accepted his consequences that may follow.

16          Now, in all honesty, I don't believe that to be true

17 here in this case.  There is no question that you possessed the

18 weapon and the jury found you guilty beyond a reasonable doubt.

19 That's certainly your prerogative to do that.  You're entitled

20 to have a trial.  You did.  And you're entitled to have a jury

21 listen to all of the facts and circumstances.  And while I

22 respect your mother's opinion that the jury was wrong, I don't

23 believe that it was wrong.

24          I believe that the jury and the evidence was

25 overwhelming, clearly correct in its determination in the case.

1  It is bothersome that you don't accept responsibility for that,

2  but again that's your -- that's your right.  And you can appeal

3  that and the sentence and -- if you believe it's inappropriate,

4  you can certainly do that.  That's your right.

5          And it's your right whether you're in jail or out of

6  jail or any citizen's right.  You have that right, and you had

7  the right to a trial.  And you had a fair and impartial trial,

8  and a jury made a determination during that trial that you

9  were, in fact, guilty.  That's the reality of the

10  circumstances.  I agree with Mr. Hinkley with a couple things

11  he said.

12          You are a very befuddling case from the very

13  beginning, the very first day that you were here.  I remember

14  thinking to myself this guy is an intelligent guy.  He's

15  articulate, done his homework.  When I look at your background

16  -- and, you know, I can't predict the future.  I can't tell you

17  what the lottery numbers will be tomorrow night or what the

18  weather is going to be tomorrow.  I can't predict the future.

19          And so often what we have to do is look at the past.

20  The past has a tenancy to repeat itself.  I hope that's not

21  case here.  But by looking at your past as Mr. Hinkley has

22  pointed out, there isn't a lot of good in your criminal past.

23  All these people write there is a different James Bailey-Snyder

24  in there someplace who isn't the person that robs people at

25  knife point or possesses a semiautomatic weapon or sells crack

1  cocaine, which poisons other people and their families.  All of

2  those things apparently are a different James Bailey-Snyder.

3  Apparently there's another person aside from the one who

4  decides that I won't come out when they tell me in the jail or

5  that I'll destroy property while in jail or possess weapons

6  while in jail.  Apparently there's another James Bailey-Snyder

7  in there someplace.

8         And it strikes me after having read all of those

9  letters every word of all of those letters, that there is

10  certainly a different James Bailey-Snyder somewhere in there

11  because I doubt all of these people could be so wrong.  But I

12  don't know which one is the real James Bailey-Snyder.  I don't.

13  I'm not a mind reader.  I have no mathematical powers.

14         And a couple of people that said today, I'm, like,

15  the ultimate authority.  I'm not the ultimate authority in any

16  way, shape or form.  The ultimate authority in your case, Mr.

17  Bailey-Snyder is you, Mr. Bailey-Snyder.  Your future is not

18  dependant upon me or anybody else.  It's dependant upon you.

19  So far you've done a pretty bad job of moving that forward at

20  25 years old.  I hope you do better in the future.  I do.  I

21  hope that you move better.

22         There have been a number of mistakes that were --

23  that I would address.  First, while I do appreciate that

24  whatever the judge was in Baltimore when you were sentenced

25  recommended Fort Dix, you should be aware of the fact that

1   judges don't have the authority nor do I have the authority to

2   direct the Bureau of Prisons as where to house an individual.

3   We're part of the judiciary.  The executive branch, which is

4   the Bureau of Prisons, they make those decisions based on

5   security levels.  And your security level is not good because

6   of your violent and drug-related background.

7           They do it based on where they have space, and there

8   are other considerations.  So while a judge can recommend

9   somebody be in a location -- and it's my understanding the

10  Bureau of Prisons looks carefully at that recommendation, the

11  ultimate authority is not with the judge, and the judge is not

12  able to tell the Bureau of Prisons where they will house

13  somebody.

14          So to the extent that, Ms. Snyder, you believe that

15  the judge directed that when Mr. Bailey-Snyder according to

16  your document in the transcript, that you believe the judge

17  somehow directed that -- he may have recommended that.  I think

18  that's the word you used.  But they have no authority beyond

19  that to do that.  I'm not aware of the ability in this

20  particular case to give you house confinement, not that I

21  would.  I wouldn't.

22          You seem to be think that would be one of the

23  sentencing options in this case.  It isn't as far as I'm aware.

24  If it was, I would not be giving it to you anyway because your

25  activities have not proven that's the kind of sentence that

1  would be appropriate for you in this case.  I don't know where

2  you're going to go in the future or what you're going to do.

3          I hope you use some of the talents that you really

4  have for good.  I hope you realize that usually when I -- it

5  comes to sentencing in a case, there's nobody here, absolutely

6  nobody, not a family member in sight anywhere.  Here you got

7  family members and friends that have come from 10 or 11 hours

8  to sit in the back of the courtroom during your proceeding.

9          So it's clear that you got a family that cares about

10  you and people that do care about you.  In the meantime it's up

11  to you to make the decision one way or the other as to whether

12  you're going to get through this present prison time and move

13  on with your life or if you're going to keep extending your

14  time or making it more difficult by your activities in prison.

15  And again, nobody can make you do any of those things.  It's

16  completely and utterly up to you and nobody else.

17          I have reviewed all the factors that I have to review

18  under 3553 of the sentencing statute, and they include the

19  nature and circumstances of the offense.  There isn't any

20  question having weapons in this prison is very serious.

21          First of all, it may be serious to have those kind of

22  weapons almost anywhere.  But in a prison system where you have

23  people who have been put there for a particular reason -- and

24  the prison that you were in was one where there were

25  particularly violent people.  And you got yourself there

1    because of robberies with a knife because of guns and drug

2    transactions, and that's why that kind of individual is in that

3    particular institution.  That's why they are there.

4         And so having a knife, a shank in that circumstance,

5    is exceptionally serious for both you and everybody else.  Your

6    history and characteristics in terms of your criminal history

7    and characteristics show very poorly on you, and that's another

8    thing you will have to live with in life.  So you have to move

9    forward if you wish.  But if you keep relying on your past, you

10   don't have anywhere to go.  That's a real negative.  You need

11   to move forward and look forward and act forward and try to

12   work your way in a different direction.

13        Again, that's up to you and nobody else including

14   your family.  It's up to you.  The Court looks at the sentence

15   that's adequate to deter you and others from committing this

16   kind of conduct.  These are things that the Court has to

17   consider when deciding what is an appropriate sentence in your

18   case.  It's a sentence to be -- to reflect the seriousness of

19   the offense, promote respect for the law and to provide just

20   punishment for you under the circumstances of the case.  The

21   Court also has to consider as necessary your educational

22   vocational and medical care.  I don't see how many of those

23   comes into place.

24        Federal prisons does have a number of programs.  I

25   know it was indicated that they don't have any.  They have a

 1   number of programs including vocational programs including

 2   educational programs.  I don't know -- I'm not aware whether

 3   they have a college degree program.  I don't know they have got

 4   that or not.  But again, it depends often on what institution

 5   you're placed in based upon your criminal history and based

 6   upon your activities in prison.  The better you are, the better

 7   the place that you get.

 8            The worse you are, the more likely you're going to go

 9   to a place where they have people they have to confine rather

10   than try to move in a different direction.  That's up to you in

11   terms of your activities as to where you earn yourself in order

12   to move in a different direction.  The Court also has to

13   consider unwarranted disparities in sentence.  While the

14   sentence is about you personally and particularly, the Court

15   also has to be aware of and the reason the guidelines are

16   suggested and were required to consider them is that similarly

17   situated people with the same or similar background as you,

18   with the same or similar conviction as you with the same and

19   similar personal history as you and criminal history as you

20   need to have sentences that are not exactly the same but that

21   there aren't unwarranted disparities, not just where the judge

22   says, I am going to nail this person or give this person

23   nothing.  The purpose is to make sure that the sentencing for

24   the same crime with the same background and same circumstances

25   is relatively within some sort of a range that seems to make

1   sense so you are not having one inmate just depending whoever

2   the judge is getting a real easy or a real hard sentence.

3           So unwarranted disparities are something I have to

4   consider in deciding what is an appropriate sentence in your

5   case.  I know there's been some discussion and talk about your

6   confinement up until now.  Constitutionally it has been long

7   decided that when somebody is in prison that there is no

8   particular confinement in prison that they are entitled to or

9   not entitled to.

10          And so inmates normally are not kept in 23 one as

11  your mother had mentioned unless they do things that require

12  them to be separated from other people.  If they don't do those

13  things, they don't end up in the S.H.U. or the R. H. U.

14  depending on what facility you're in.  They are activities that

15  are -- you have control over by your activities.  I don't

16  necessarily disagree with a lot of things Ms. Cronin and your

17  mother had said.  I don't disagree that we spend an awesome

18  amount of money incarcerating people and that I -- if you can

19  figure out a better way, I would be all for it, but I don't

20  have any magic wands.  I can't sit here and just wave the magic

21  wand and make you decide that I'm not going to cause more

22  trouble, I'm not going to possess a weapon, I'm not going to be

23  troublesome or break up things in jail and I am not going to

24  commit any more times.  I don't have a magic wand to be able to

25  do that.  If I did, believe me I would use it.  But I don't

1  have one.  Additionally, I agree with their perspective on the

2  fact that being in the S. H. U. for a long period of time is

3  not something that I personally think is beneficial.  But the

4  other side of that coin is, I'm also not the one that's there

5  actually seeing and having to deal with the activities of

6  inmates who act up and act bad and cause problems and leave

7  other problems with other inmates.

8          So unfortunately it's an imperfect system, but it's

9  the only system presently we have.  Having considered all of

10  those factors and pursuant to the Sentencing Reform Act of

11  1984, it is the judgment of the Court that the defendant, James

12  Bailey-Snyder, is hereby committed to the custody of the Bureau

13  of Prisons to be imprisoned for a term of 30 months.

14          The term of imprisonment imposed by this judgment

15  shall run consecutively as required by law to the defendant's

16  imprisonment imposed under docket number R. D. B. 12-631 in the

17  District of Maryland.  The court finds the defendant does not

18  have the ability to pay a fine and a fine is waived.  It is

19  ordered that the defendant shall pay to the clerk of U.S.

20  District Court a special assessment in the amount of $100,

21  which is due immediately.

22          As the defendant has previously had imposed upon him

23  a term of supervised release, and terms of supervised release

24  are by law to run concurrently with each other.  Pursuant to 18

25  U.S.C. Section 3624 E., the Court is not going to impose an

1  additional term of supervised release in this case since it

2  would just run concurrently to the one you will have to serve

3  once you have been released on the Baltimore case.

4          As a result, I'm departing under the guidelines and

5  not imposing an additional term of supervised release upon you.

6  It is ordered that you will cooperate in the collection of a

7  D.N.A. sample by the probation officer upon your release if not

8  collected during your incarceration.

9          Now, I advise you of your right to appeal your

10  conviction and your sentence to the United States Court of

11  Appeals for the Third Circuit.  If you are unable to pay the

12  costs of appeal, you may apply to appeal in forma pauperis.  If

13  you do that, the Clerk of Court will prepare and file a notice

14  of appeal on your behalf.  They also will if you request from

15  the Court of appeals appointment of counsel consider appointing

16  counsel to represent you in your case.  Do you understand all

17  of that, Mr. Bailey-Snyder?

18          THE DEFENDANT:  Well, in part, yes.

19          THE COURT:  What part don't you understand?

20          THE DEFENDANT:  I didn't -- I thought Mr. Reish would

21  be handling my appeal.

22          THE COURT:  If you request -- once we finish here in

23  the district court, technically his appointment by the district

24  court is concluded.  But if you request counsel be appointed,

25  since Mr. Reish had tried the case, he will most likely be

1 appointed to represent you in your appeal.  What else don't you

2 understand?

3          THE DEFENDANT:  I didn't know I had to file.  I

4 learned -- I was under the impression he carried over and the

5 notice of appeal --

6          THE COURT:  No.  You must file a notice of appeal.

7 In fact, you have 14 days from today under the rules to file a

8 notice of appeal.  Today is the 15th day of March 2018.  That

9 means if you wish to file a notice of appeal, it must be filed

10 on before March 29th, 2018.

11          THE DEFENDANT:  Can I put it in orally now?

12          THE COURT:  No, you must do it in writing.

13          MR. REISH:  I will talk about it.  It's my practice

14 to file a notice of appeal on behalf of any client I

15 represented in district court.  So I did advise him I will be

16 filing a notice of appeal.  His confusion --

17          THE COURT:  That's the proper practice.

18          THE DEFENDANT:  Also prior to closing this up, I was

19 curious about some of the things that I need to subpoena for my

20 appeal.  Since I am now without counsel, I do need them

21 subpoenaed because I have been asking for them to be subpoenaed

22 before trial.

23          THE COURT:  My suggestion is you do a couple things.

24 One is you request counsel on appeal.  When Mr. Reish is

25 appointed, you can cover those matters with him.

1          THE DEFENDANT:  It seems like it's a toss up of -- a

2   little bit of confusion, you know.

3          THE COURT:  I don't think there's any confusion.  You

4   have 14 days to file a notice of appeal.  If you request to

5   file forma pauperis, meaning you can't afford to pay the costs

6   of appeal, that will be granted to you, and counsel will be

7   appointed.  It will be Mr. Reish.  But that's a different court

8   than this court.  So there's a little break that occurs.

9          If you got other questions about that, Mr. Reish is

10   still with you, and you can ask him questions about that.  Is

11   there anything else you don't understand?

12          THE DEFENDANT:  No, sir.

13          THE COURT:  Good luck to you, Mr. Bailey-Snyder.

14          THE DEFENDANT:  Thank you.

15

16

17

18

19

20

21

22

23

24

25

38

REPORTER'S CERTIFICATE

1

2

3      I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Pennsylvania, appointed pursuant to the provisions of Title 28,

6  United States Code, Section 753, do hereby certify that the

7  foregoing is a true and correct transcript of the

8  within-mentioned proceedings had in the above-mentioned and

9  numbered cause on the date or dates hereinbefore set forth; and

10 I do further certify that the foregoing transcript has been

11 prepared by me or under my supervision.

12

13

14                              _____
                                  Laura Boyanowski, RMR, CRR
15                                Official Court Reporter

16 REPORTED BY:

17      LAURA BOYANOWSKI, RMR, CRR
        Official Court Reporter
18      United States District Court
        Middle District of Pennsylvania
19      235 N. Washington Avenue
        Scranton, PA  18503

20

21       (The foregoing certificate of this transcript does not
   apply to any reproduction of the same by any means unless under
22 the direct control and/or supervision of the certifying
   reporter.)

23

24

25